We'll hear argument next today in case 10-218, PPL Montana v. Montana. Mr. Clement. Mr. Chief Justice, and may it please the court. The state's claim to back rent here is truly remarkable. When these dams were built back in the day, PPL's predecessors, petitioner's predecessors, secured all the necessary property rights and easements. As part of that process, particularly for the dams that created reservoirs, there was an elaborate process of getting flood easements and in many cases paying substantial amounts of money. In that process, nothing was hidden. It was open and notorious. Indeed, the state assisted by lending the utilities its eminent domain power to deal with holdouts. But now, a hundred years later, the state comes in with a holdout claim of its own and suggests that it's entitled to massive compensation based on the small strip of riverbed that lies underneath these flooded reservoirs and the dams. The Montana Supreme Court allowed that claim to succeed to the tune of tens of millions of dollars of back rent. Now, it would be that Kennedy, is your point that there should be a Federal rule of latches or stophole or are you just building up to the fact that this is traditional, well-recognized doctrine and there's been a sudden change? That's exactly where I was going, Justice Kennedy. I was suggesting that the Montana Supreme Court could only approve this result, which clearly did unsettle settled expectations, by deviating from well-settled principles of Federal navigability law. Now, the mistakes were a little bit different for each of the rivers at issue. As to the Clark Fork and the upper Missouri, the critical error, I believe, with the Montana Supreme Court decision was its failure to focus on the river segments that are directly at issue and instead focus on the river as a whole. With the Madison, the errors are different, because as the Madison, there's no evidence that any stretch of that river was navigable at statehood. So there, the problem was principally that the Court relied on modern-day evidence of recreational use to substitute for true historical evidence of commercial navigation. Alito, on the issue of whether we should look to the segments or to the river as a whole, what authorities can we consult? You rely heavily on U.S. v. Utah, and that certainly is a relevant precedent, but there's a disagreement about what it means. And the only authority I see that U.S. v. Utah cited was the Montello, which seems to cite nothing whatsoever. So where do we – is that the end of the trail? Is there any place else we can look? Well, I mean, it's close to the end of the trail. I mean, you can go back to the Daniel Ball, but that's not going to help you any more than the Montello. I think, though, that the critical cases really are Utah, but I also think there are other cases that this Court has had, Oklahoma v. Texas would be an example, where this Court has looked at a discernible segment of a river. Brewer-Elliott is another one. And I think the starting point for the Court's analysis in every one of these cases has been to look at the segment of the river that's at issue, that's been put at issue. Now, if you have a sovereignty battle between the State and the Federal Government, a lot of times it's the segment of the river within a State, or in Brewer-Elliott it was the segment of the river adjacent to an Indian reservation. Alito, because we get our common law from England. In England, actually, the common law was different. At England, the navigable waters ended at the ebb and flow of the tide. So every internal stream within Great Britain was viewed as non-navigable, and the property belonged to the riparians. So what is the origin of the rule that the original 13 States owned the navigable rivers or parts of the rivers, but not the parts that weren't? That was some feature of American colonial law? Sure. I mean, it was adopted as part of the sort of just the idea of creating the sovereign Republic of the United States. We borrowed our common law. I think initially nobody focused on these navigable segments. And it's important to recognize this issue really doesn't even arise in the eastern United States, because until about 1850, this idea that States could own the riverbeds if they were non-navigable never really occurred to anyone. So in most of the eastern States, as a matter of State law, whether a river is navigable or non-navigable, the riparian owns to the middle of the streambed. So after 1851, this Court recognizes, makes clear to the States that they actually have a choice. And so the States that come into the Union after 1851, many of them, including Montana, adopt the rule that, well, unless these — if these streams are non-navigable, then we take the river stream. And so that's where the question comes up. So maybe the reason there isn't a great deal of precedent on this is explained by the fact that this is an issue that largely arises in the western United States. But that's why I think it's such a mistake to kind of look a gift horse in the mouth, so to speak, and not focus on Utah, because Utah is a situation that seems irreconcilable with the Montana Supreme Court decision and the States' basic theory, because there the special master and this Court recognize a non-navigable segment right in the middle of two navigable portions of stream. Sotomayor, and I'm not here to give you a soundbite that's a bright-line definition of de minimis. I think de minimis, almost by its nature, takes its — its meaning from the context of the inquiry. But let me — let me offer at least three guideposts that I think are helpful. One, as a practical matter, I think this Court can look to its own case to see if it can be used to define the definition of de minimis. The first is that the United States has a number of cases dealing with islands and navigable stream, and those cases are on page 17 of the government's brief. And this Court's cases say if there's a small island and a navigable stream under an acre of negligible value, we basically ignore it. Later cases, though, came along and dealt with islands that were much larger, and the Court analyzed those separately from the navigable stream and said the United States actually retains ownership to the larger islands and they don't go. So that's one place to look. The second is that the United States has a number of cases dealing with riverbed stretches that are significant enough to generate $50 million in background. And I think they, having identified those riverbed stretches as being worth $50 million, are hard-pressed to then turn around and say, oh, but they're de minimis, just ignore them. The third rule I would point to is that I think topography has something of a role to play here. If you look at the Special Master's report in Utah or some of the other cases that have decided to the point at which navigability stops, they pointed to features of the river as defining a discernible segment, like a tributary coming in or the geology of the bed over which the river runs. If it shifts from kind of a silty loam to hard rock in a canyon, that's something that you can point to. Sotomayor, I know you've told me that you think Montello is not pertinent because it involved a different issue. But assuming that it were pertinent, because I'm not quite sure how its discussion doesn't fit the needs here, one of the factors you haven't mentioned in terms of de minimis is the portage and its use with respect to commerce. And by that I mean, it appeared to me in Montello what the Court was saying was the history of use of this river showed that these obstructions didn't stop the flow of commerce, that what people did was, it appeared, some extreme things. They got off, they got their goods off one boat, walked it a certain distance or drove it by wagon another distance, and then put it on another boat or the same boat that they had lessened the load on and moved it over. And so it doesn't talk about the distance of that portage. It talks about the impact on commerce. And so why isn't that a factor in the de minimis issue? If there were a history here. Clements, I mean, there's sort of two portages that are floating around in the Montello that I think it's important to distinguish between the two. There's kind of the classic overland portage between the Fox River and the Wisconsin River. Sotomayor, there was a canal in there, wasn't there? Well, afterwards. But originally that was an overland portage. And so that's really not at issue. But that's kind of the classic portage I have in mind is an overland portage. Now, they're also talking about the extreme efforts, and you could call them portages. I don't think you need to. But there's also talk about the extreme efforts to enable navigation on the Fox before improvement. But that's nothing like what's at issue here, because those were efforts basically to use the riverbed to — and they had to do some extraordinary things, get ox to pull the boat, lift them up over some rocks. But they never really left the bed of the river there. Where they left the bed of the river was the portage over to Wisconsin. Well, in Montello, they took the cargo off some boats. Oh, absolutely. And moved it overland to another spot before they put it back on a boat. Sure. But my understanding of what was going on there, and maybe I misunderstood it, but I understand what they're talking about there is a portage where you take the cargo out of the boat in order to lighten the draft of the boat, so it's not sitting as deeply in the river. And that allows the lighter boat to be carried over the — We can both look at the opinion, but I think there is one spot where the Court says that in some areas they had to change boats. Well, and that may be, but, I mean, again, I don't think we're talking about anything like the distances that we're talking here. And I also — But what I'm asking is, if we had a history of navigation of cargo that went to the beginning of one of these rivers — and I'm not a sailor, so my terms — the cargo is taken off and driven by wagon or some other mode to another spot and picked up again, is that a different situation than one where that doesn't happen? That because this set — this length of portage is so long that it is both economically and physically impossible to transport cargo in that way, is that a different case for the question of navigability? Well, sure, because these are all matters of degree, and those would be two different cases. But here is what I would point you to, which is, if at the point that you have to take the cargo off of the boats, and then you then have to leave the channel, you don't just do a little cut around some de minimis amount, but you leave the channel and go overland, at that point, I think that portage demonstrates the non-navigability of the bypass stretch. And then I think we would still speak of the transfer of commerce as being along the river. The sort of case, the analogy I was thinking of, is if I say I fly from Washington to Tokyo, and someone says, no, you didn't, you flew to San Francisco, then you walked however many yards from one gate to another, and then you flew to Tokyo. And I would say, well, yes, there is a gap there when I — part of the distance where I wasn't flying, but people would still say you flew from D.C. to Tokyo. Now, why isn't this just like that? That the commercial path, the commercial waterway, people think of as the Missouri. And, yes, occasionally you've got to get out and, you know, we can debate how long the portage is, but it doesn't interrupt the notion that that whole pathway would qualify as a navigable waterway. Well, two things, Mr. Chief Justice. One is, I do want to make clear that we very much dispute factually that there ever was this kind of commercial portage over the Great Falls. And really, you know, there's very little evidence for the record. The State's own evidence identifies Fort Benton, 30 miles below the Great Falls, as the head of navigation on the Missouri. So there is very much a factual issue here. But to answer the legal question you're asking, first of all, I'm not sure I would have the same instinct about common parlance if you had to go from JFK to LaGuardia in a cab, and I'm even less sure that you would have the same notion if you had to drive from San Francisco to L.A. to switch planes. And I think the distance here really does matter. And I would submit the way you think about this, the way I would think about this, is that the very need to bypass, especially a substantial bypass where you leave the river channel, is evidence that that part of the channel, that part of the river, is non-navigable. And then the question that's left is whether that's de minimis. I don't see why portage is relevant at all. What's the basis for the rule that the sovereign owns the navigable rivers? I assume it's because they are viewed as highways for transportation and commerce. And to the extent that there's an obstruction that cannot be traversed by a boat, then there isn't going to be any commerce or transportation along that area. Now, there might be an argument that the sovereign should own the land next to the river so that you could portage around it. But what would be the justification for saying the sovereign owns the portion of the river that can't be traversed at all by a boat? I just don't understand it. Well, I'm with you on that, Justice Alito. And I think, you know, logically, if you think what's the highway of commerce here, if there really was this 18-mile overland portage route, that would be the highway of commerce. But the 17-mile bypass stretch of the Missouri in the Great Falls Reach would not be a highway of commerce. And I think that gets back to the expectations of the property owner that ultimately underlie these title questions. I mean, if you have boats going by a river in your backyard, I mean, you have a — you're going to sort of notice that you don't own the riverbed. But if you're in a part of the river that's so unnavigable that it has to be bypassed and you've never seen a boat in your experience ever, then I think you have very different expectations, and your expectations would be the same as somebody's. 17 miles is very long. It is. I think the Thompson is only 2.8. Well, that's really close to Montello, where it talked about about 2 miles for some portage areas. Well, with respect, if I could take both points, I mean, you're absolutely right, 17 miles is very long. I mean, for the New Yorkers, you know, the East River is 16 miles long, the whole river. The Anacostia River is 8-1⁄2 miles long. So this bypass stretch of the rivers is still a big stretch, and I do think, like I said, longer than some entire rivers. But the Thompson Falls, I mean, the 2 miles of the Thompson Fall, I don't know exactly where that number comes from. It's kind of an artificiality. I mean, again, the State's own evidence, look at JA-57, says that navigation stopped at Thompson Falls. There wasn't a portage around. But the other point is, I would also ask you to look at the 1910 court decree, because as I said at the outset, you know, these companies didn't just put these dams up overnight as, you know, kind of as a lark. They went through elaborate efforts to secure the property rights. That's what generated that 1910 court decree about the Clark Fork River. The Clark Fork River court decree in 1910 addresses a stretch of river specifically that's not just the falls, but those 6 miles of the reservoir that's created. And the Court holds that that entire region and, indeed, the entire Clark Fork in Sanders County is non-navigable. So the stretches that are non-navigable are much longer than 2 miles. If I may reserve my time. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. The Montana Supreme Court committed 3 basic errors with respect to all 3 rivers that require a remand for further proceedings to actually weigh and make factual findings concerning the evidence of the relevant reaches of the river for purposes of navigability for title. We're not talking about navigability for interstate transportation or admiralty or regulatory jurisdiction under the Rivers and Harbors Act or the Clean Water Act. We're talking about navigability for title. And why does that make a difference, Mr. Kneedler? Mr. Kneedler, why do you think that there are separate tests for title than for regulatory authority? Well, in the Montello, for example, the question was whether there was admiralty or regulatory jurisdiction over the use of vessels on the upper reaches of the river. And that depended, in the Court's view, on whether that stretch was part of an interstate or international highway of commerce. And so it would make sense to look at the whole river in determining whether there's a highway, and maybe in deciding whether there's a highway, you would look to a bypass stretch, you would look at the highway, the land highway, to decide whether it's useful in interstate commerce. For title purposes, though, the question is what happens to the stretch of the river right in front of the riparian owner's land? As Mr. Clement said, that reflects the expectations of the property owner, that it would be, if there are no ships or boats going back and forth, that that property is adheres to the riparian land more. I also think it pertains to the control or use of the beds of the rivers themselves. Roberts, I think, though, if you start drawing these lines, they become very difficult in some rivers anyway to apply. I'm sure there are seasonal fluctuations, maybe navigable in some seasons, but not in others. The line in which you pass from navigability to non-navigability may be difficult to ascertain. It seems to me once you start chopping the highway of commerce up, it does create all those difficulties. Well, first of all, we're not talking about chopping the river up into narrow slices. I mean, I think there has to be a discernible and substantial segment of the river. Often it will be self-evident from the topographical features of the area. Are there major falls and rapids over an extended period of time? But also the points you're raising are, I think, are inherent, because in deciding where navigability stops under any test or in any circumstance, you could have the difficulties that you have described.  Sotomayor, do you agree with the point that Mr. Clement made as guideposts that there is a situation and not, and how do we tell falls below? Kneedler, I think it may well be. I think an important – I agree with the points that Mr. Clement made as guideposts. I think another one, and this pertains to the fact that there's no falls, but there are riparian orders that don't permit navigability over 2.8, and that's still navigable? I'm not sure. Kneedler, no, I think it has to be – I'm speaking of a situation where the river is not navigable, in fact. And that's the test, navigable in fact, not navigable in law. So if a boat cannot pass in front of the riparian land, then that would be non-navigable. I agree that that's true. Scalia, and it shouldn't matter whether it's 2.8 miles or 1 mile, right? Well, I mean, if the land is non-navigable, if the river at that point is non-navigable, it's non-navigable. For title purposes, yes. That's what we're talking about. Yes. And I don't want to say why there ought to be any de minimis exception. Well, I think at some – if you consider part of what's going on here is who controls the riverbed, I think it would be unworkable to have a passage or a portion of a river where you had 10-foot strips across the river that a riparian owner owned and the State owned everything else, or if you had stripes across a river. So I think the test also has to take place. But how would the boat get up there? Does it just jump over the 10 feet? I mean, what's wrong with that? Well, in the Montello, there's evidence that the boat was lifted by the men got out of the boat and lifted the boat up over the falls. Okay. Then that would work. Pardon me? Then that would work. In that situation, but if you had a long stretch of river where that was not practicable, then you can't lift a boat over Niagara Falls. And I read somewhere that – I hope I'm wrong, but I have a feeling I read somewhere that the land under Niagara Falls has long been considered to be navigable and therefore it's owned by the United States. It's owned by the State. It's owned by the State. Yes. You mean the navigable – I get mixed up in that. The reply brief, I think, does not. The navigable ones are owned by the State. Okay. Everybody's thought the land under Niagara Falls is owned by the State. Oh, dear. Because that sort of wrecks our nice theory that all the steps, all the little bits of it that are non-that are aided. I think that's not an extended strip in the way that we're concerned. Okay. Now we have to define what's an extended strip. Well, if I think there are countries. I thought it's also an international boundary. Yes. As to which there is a different rule. Yes. And the order is different. Okay. So how much are we wrecking if we just say, look, the bit that's non-navigable is different from the bit that's navigable, period. Well, it doesn't matter if it's 5 feet of land or not. What are we wrecking? I think it does matter whether it's 5 feet, because the – because an important point here is that who can make sensible use or control the relevant stretch of the river.   I have another quick question, which you could probably answer just by saying we decided not to, but I was somewhat curious. It's really the United States v. Montana in this, who owns the land, and it's a question of Federal law. It's going to be highly factual no matter what this happens, made for this Court's original jurisdiction, and normally in the original jurisdiction we appoint a master, it's worked out, and we review the master's report. We can't do that here because it's a case of why didn't you go into or why couldn't you go into a quiet title action at Federal court? We could, and we have not given consideration to that, but that might be a possibility. The United States is not a party to this case and couldn't be bound by the judgment. I couldn't have intervened somehow, because the United States has come here rather reluctantly, as you recommended against Randy Cert in this case. When this was in the Montana courts, and it was a question of what is the Federal law, because Federal law is going to control, everybody agrees that, could the United States have come in to the proceedings in the Montana State court? Ordinarily, the United States would not intervene in a State court proceeding, or if it did, it would remove the case to Federal court. So that would be an additional consideration as to whether to get into this suit. The United States would typically bring its own quiet title action in Federal court. Roberts. Your answer a moment ago gives me pause. You said the United States would not be bound by this litigation, but could bring its own quiet title action? Well, we would be bound by this Court's decision, obviously, but I was just speaking of the law of judgments. And if this Court remands back to the trial court with general directions but doesn't adjudicate particular stretches, definitively, then, you know, I think we that's the situation that we would be in. And if it were remanded, the United States would still stay out of it, because it's going to be in the State court. I assume so. Obviously, that would be a further consideration. Am I to take that de minimis to you means small enough so that they get the boat physically over the portage? Physically over the portage. Whether they carry it, drag it. No, I think if they can take it through the river, it's not an interruption at all. But if you have something that can't be transversed by a boat at all, and it's long enough that it could sensibly be thought of as a separate parcel adhering to the riparian land, that would be. Sotomayor Go back to carrying the boat on their shoulders, which apparently in the Montello they did. What's the answer? They didn't carry the boat out of the river. These were Durham boats that were 70 feet long and weighed quite a bit. Now, maybe there were small canoes that could have been done. I think a small portage, again, I don't think it's the length of the portage. I think it's the interruption of the navigable portion of the river that is relevant. And if it's large enough to constitute a sensible, administrable parcel, that that should be enough. I did want to take one moment to discuss the Madison River, because there, as Mr. Clement discussed, the considerations are somewhat different. First of all, the Court made a similar mistake there by discussing the river as a whole and a log float in the middle stretch of the river, but not focusing on the relevant stretches where the dams are located. But it also put a lot of emphasis on current recreational use by drift boats and whatnot without a proper foundation to determine whether that was relevant for title purposes at statehood, because the relevant question is whether the — whatever boats are used now are ones that would have been used as custom — this is the language from the Daniel Ball — as the customary modes of travel and transportation at the time of statehood. It's kind of odd. Roberts, maybe this is Justice Alito's earlier question. It's kind of odd that the more navigable the river is, the more claim the State has. The less navigable, when you're talking about sports boats and drift fishing, then it's Federal. Well, that's a product of the equal footing doctrine, and the Court has long said that the State gets the beds of navigable waters. Roberts, thank you. Thank you, counsel. Mr. Garre. Thank you, Mr. Chief Justice, and may it please the Court. This case is about who owns the riverbeds underlying the rivers at issue. It's not about floodlands. It's about the riverbeds. And under this Court's precedence, it's settled the title to the riverbeds conveyed to the State under the Constitution if they are navigable. It's been understood in Montana for more than a century that these rivers are navigable. The rivers were meandered as navigable. PPL's deeds, and this is at page 172 of the appendix to the opposition brief, specifically exclude the riverbeds. The test for navigability that this Court has applied for 140 years, going back to the Montello and the Daniel Ball, is whether the river served as a continuous highway of commerce. In the Montello, the Court recognized the fact that few of the nation's great rivers did not include some, quote, serious interruptions to uninterrupted navigation. And the Court's answer to that geographic fact was not to say, then let's carve out the interruptions and say those aren't navigable. The Court's answer was to say unbroken navigation is not required to establish navigability. Sotomayor, your theory, if there's a fall like this of 17 miles and a train is 50 miles away and traverses that 17 miles, that portage? Under this Court's precedence, you have to show that the commerce traveled along the river under the customary modes of trade and travel. Outside of your fur traders and your gold miners, has that happened in any other situation? You're alleged gold miners and fur traders. Has that happened on the — in the Great Falls? If you take the Great Falls, the history of portage from 1864 to 1868 was lively commerce of millions of dollars in today's value, billions of dollars of gold from Helena to Fort Benton back east. This is covered in detail by the Solicitor General briefs that we've appended here. Sotomayor, could you do me a favor and tell me again, I'm having real trouble with the competing evidence in this case with respect to every one of the three areas in dispute. And I have some serious questions about whether the Court properly granted summary judgment. Your brief seems to suggest that I can't do — we can't do anything about that because it wasn't a part of the question presented. Your adversary says that it's a fair question if we determine there's any legal approach — error in the legal approach of the court below. I'm assuming that also means on their weighing of evidentiary matters. So why shouldn't we address the summary judgment issue? The question presented is whether the Montana Supreme Court or whether a court — a court — what the constitutional test would be for a court in this situation. It's not even limited to the Montana Supreme Court here. It presents a legal question. With respect to summary judgment, the problem for PPL is not that it didn't present enough paper. The problem is, is it litigated the case under a wrong legal theory. It litigated the case that the Missouri, for example, was not navigable because you couldn't take a boat down the falls. This Court's precedence for more than 140 years asks the question of whether the river served as a continuous highway of commerce. We presented evidence summarized in the case. For what purpose? Were they — were they — were we answering the question for the same purpose? Or were we asking it for purposes of whether Federal regulation could extend to the whole river? For that purpose, it's easy to say if the whole river is, you know, used for commerce, the Federal Government can regulate even those portions of the river that are not navigable, but that have to be portaged around. But that's a different question from who owns title to the bed under the portions that have to be portaged. Your Honor, PPL recognizes that the Daniel Balls applies the test for navigability for title. This Court recognized that in the Utah case, the Vanguard title case that they hold out. So the only question is, did the Montello apply the Daniel Ball test or did it apply something else? And the first paragraph of the Court's decision in the Montello said it applied the Daniel Ball test. Courts — this Court and lower courts for more than a century have understood the Daniel Ball and the Montello to supply the test for navigability of title. What they're asking this Court to do is upend more than 140 years of precedent, and the amicus brief filed by the States in this case gives — gives the Court a sense of the disruption that this would cause. Alito, what do you understand to be the reason for the rule that the States own the navigable rivers? The reason for the rule was the public trust doctrine, which — which sought to keep these rivers free for the public to use for navigation, for fishing, and for other uses. And this Court's precedence— Alito, what do fishing and navigation have to do with — what does fishing have to do with navigability? Well, it gets back to the public trust doctrine, Your Honor. Fishing doesn't have to — fishing is a purpose of the public trust doctrine, which is why it was understood— Well, let me put it this way. Why — why should it — why does the State own a navigable river but not a non-navigable river? Because the navigable rivers were the arteries of commerce in this country. And at the time of the founding, it was understood, and this gets to the core issue of Federalism in this case, that the States ought to be the ones that control the navigable rivers, not the Federal government. If that's the reason for the rule, then what is the justification for State ownership of a portion of the river that is not navigable? I think this gets back to the question of whether you can just chop up the rivers into navigable and non-navigable bits. And we're talking about — this Court, Justice O'Connor, observed in her dissent in the Phillips Petroleum case, that navigability wasn't decided inch by inch. What the other side is asking to adopt here is a test of navigability that's at least mile by mile, if not acre by acre, which is completely different than this Court has ever assessed navigability. The rule that you're arguing for might be an established rule that we should follow, but as a matter of theory, I don't understand what the justification is for State ownership of a non-navigable portion of the river if the reason for the underlying rule is so that people will not put up obstructions on the river, so that it can be maintained as an avenue of commerce. I can see why the State would own that, because otherwise, riparian owners could put up fences and obstructions and charge tolls and that sort of thing. But if it's not navigable, I don't see what it has to do with commerce or transportation. What the Framers were concerned about, and this is also reflected in the Northwest Ordinance 2, was ensuring that the navigable rivers, the major arteries of commerce in this country, remained open. And so they applied a much more — a much broader conception of navigability than is suggested. Scalia. But they're closed where they're impassable for ships anyway. They're closed. What do you mean remain open? You've got falls, you've got waterfalls, you've got rapids. What does it mean to be sure that that river remains open to commerce? Commerce is impossible over it. And so that was the argument that the district court adopted in the Montello case, and this Court emphatically rejected it. And by the way, the portage of the Montello case was 5 miles long. That's reflected in the record in that case before this Court. Ginsburg. Mr. Cobb, what is — you say that you're not taking just — you look at the whole river as a whole. You're saying, no, no, that isn't your position. No, it's not. But it's also not inch by inch. So what — when is segmentation appropriate? I think the relevant stretch or segmentation is really a litigation term. Our position is this Court's test, continuous highway of commerce. You would take the part of the river at issue in the case, take that part and look and ask the question, was that part of a continuous highway of commerce or not? So if you found yourself in Cataract Canyon in the Utah case, you'd ask yourself that question and you would say, no, this is not part of a continuous highway of commerce because no one argued either that the canyon was portaged or that goods were traveling down the Colorado River through the canyon and out into Arizona. If you asked yourself that question in this case along the Great Falls, you would say yes, because the evidence was unrebutted that millions of dollars of gold was traveled up from Helena to Fort Benton along the Missouri River with the aid of a portage, and that that was unquestionably a highway of commerce. What they are asking this Court to do is chop rivers up into navigable and non-navigable pieces. How would that impact the public trust doctrine? The brief filed by the national law firm. Ginsburg. So you are disagreeing with the United States, which has given us its view of what the Federal law is. It doesn't coincide with Montana's. The United States has sided complete with Montana. The answer it gives for what is a short interruption in its brief is an interruption that doesn't warrant separate consideration. That's on page 17 of its brief. That's the epitome of a circular test. Breyer. I mean, waste your time for a second. Why do the Feds own the land underneath the under the non-navigable parts? Why do the Feds own the land under non-navigable stream? I think if you applied the proper test here, you would conclude that the river is very. Breyer. I mean, Little Creek somewhere, which you would think, gee, those belong to the State. But it turns out the Feds own the land underneath the Little Creek. Is that right? I think what the non-navigable parts didn't transfer under the equal footing doctrine. Oftentimes, those are subject to separate conveyances, so they might come into private policy. I think the rule is on the non-navigable streams, it depends on what the conveyance was at the time of statehood, and those are individual matters, and sometimes you will see the Feds own them, sometimes the States. Is that right? Yes. I think that's right. And what was critically important to the framers was that the States would have control of the navigable waterways. This Court has described that as an essential attribute of State sovereignty. But we're talking about the land at the bottom of the river. What is it that the State can't do on the navigable waterways that it wants to do? Well, ownership, along with ownership, goes the right to control whether facilities can be built on them, bridges or pipelines. It goes along with that, goes the rights to mineral leases, along with that. But as the Chief Justice is indicating, I think, this concerns who owns the bed. And that's different from navigable waters of the United States. And some of the answers you gave to Justice Alito about the purposes and the reasons for navigable waters of the United States are quite different, really, than for the considerations we have about riparian ownership. The navigable waters of the United States can be controlled by the United States for many purposes. But that is concurrent with a separate document, a doctrine, for underlying ownership of the bed. Right. And it's not clear to me that the test for navigable waters is the same in each case as to the whole river. I think that the test that we're articulating is the Daniel Baum and Montello test, continuous highway test. I think with respect to the riverbeds, it's always been understood that with control of the riverbeds along navigable waters, States have a right to control fishing, navigation, and other aspects. Now, Montello was a case, to follow up this same question, Montello, I take it, was not a title case. Montello was a regulation of the stream case. So I can understand perfectly well why that language in Montello applies, for the reason Justice Kennedy just said. Now, I grant you that they've, in later title cases, this Court has taken the same words and written them. But is there an instance in the later title cases where that language has played a controlling role? What case should I look at to see that it was really meant that that this … Breyer. You start with what Justice Scalia was and then say what Justice Kennedy just said. And then thinking, well, I'm thinking, well, Montello was a case that involved a different purpose. And now the later cases, although they quoted the language, it didn't have a role. Am I right or not? This case has recognized always that the Daniel Baum and the Montello is the test for navigability for title, as well as Admiralty. It's never drawn the kind of distinction that PPL and the United States has here. And it's never held that. Do you have a case where it would have made a difference? Not of this Court. And the lower courts have relied upon the Daniel Baum and the Montello in plenty of circumstances adjudicating title. I think the Court has to think about what the world would look like if the Court adopted PPL and the United States did. If this is such an understood and traditional rule, why didn't Montana make its – its rights known earlier when these private owners bought the land? Indeed, the State gave them condemnation power to flood adjacent lands so that they could build their dams. And you say, while all this was going on, oh, of course, everybody knew that – that Montana owned this land. And now they come back, what, 100 years later? And they not only want to get the land back, they want to tax them for their use of it over all these 100 years. That's extraordinary. Your Honor, PPL's deeds specifically exclude the riverbeds at issue in this case. So PPL can have no claim to those lands. And in fact, in its supplemental brief, says that the United States owns the lands. We're not talking about the floodlands here. We're talking about between the low water marks. Those lands were surveyed and meandered at statehood to show that they did not convey to private parties. Montana courts have recognized for more than a century that these waters are not navigable. Everybody understood that they were navigable. The reason why this issue only arises now is because of a 1999 decision of the Montana Supreme Court that said that the State made clear that the State had a fiduciary obligation to seek compensation for the use of the riverbeds. So that then teed up the question of whether the State could actually charge rent  The State in this case can't. Kagan. What about other landowners on the riverbeds? If Montana wins this case, will they be paying rent as well? They're not using the riverbeds, Your Honor. The reason why the facilities here are using the riverbeds is because they actually sit on it. There are other instances where private landowners have easements and leases like mineral leases with the State under the end of the — because of the accepted understanding that the State does own those lands. And this is not at all unusual. If you look at the State's brief, Washington and Oregon have thousands of these types of permits because it's established that if the water is navigable, then the State owns the riverbeds, and there are consequences that flow over this. But this really isn't a fight between the State and the private landowners. It's a fight between the State and the United States, because if this case was just a one-of-a-kind landowner, there are no other landowners in Montana who are in the situation of BPL? No. I think there are other landowners who have asserted — who want rights to use — to get minerals along rivers or have piers or bridges, and in those situations, they get permits from the State to use it. But I think what's going to happen is if this Court declares that every mile or so that is an interruption is non-navigable, then title is going to transfer to the United States, because under this Court's precedent in Utah, the Court held that if waters were not navigable, the United States would have title to transfer. Sotomayor Is there a mile stretch anywhere on this river? A mile stretch? Yeah. Is there a mile stretch in which the boats stop, some water in the middle, and — There are two areas at issue here. The Great Falls stretch — I know the two at issue, but you're saying if we rule the way we do, we're going to slice it up, and so does the Solicitor General's office say. We're going to slice it up a half mile or half acre by half acre. I'm not sure how that happens. I go back to Justice Kennedy's question, which is, does a boat stop midstream? So the test would be any non-de minimis interruption. That's the one that PPL and the United States are urging here. There are thousands of dams in the country. There's the Niagara Falls, which for more than a century it's been understood that the State owns it, not because it's an international boundary. That's a line plucked out of the decision. Read the decision. So how do I find that out if I start with a practical premise of not wanting to interrupt expectations? I also believe that it's the most common thing in the world for electric power companies to put hydroelectric facilities where there are waterfalls or rapids, and that's true all over the country. So what's the status quo with the — you know, somebody could count up how many hydroelectric plants there are on waterfalls, and what's the general view? Have those hydroelectric companies been thinking that they're leasing or buying from the Feds or from the States? I mean, I don't know what's happened in the past, and I've looked at the briefs. I can't get a very good picture. The best evidence I think we have about this question and the implications comes from the brief filed by 26 States, which explains that if this Court adopts a kind of segmentation approach, any interruption that is not de minimis has to be carved out. It's going to wreak havoc in the States across the country, especially in the Western States. Again, getting back to the point of the brief filed by 26 States, I don't know what's happened in the past, and I can't get a very good picture of what's happened in the past. I'm not referring to specific leases on that. I'm talking about things like public access for fishing, for example. The States have cited the steelheader case in Oregon, and this is what's going to happen. Either the public private landowners are going to claim people coming along, my banks, to fish, they don't have access to these waters. If they were navigable, understood as navigable waters, owned by the State, it's clear that they would have access. There's going to be clashes. There's going to be — Scalia, I thought you said it doesn't belong to the private individuals. I thought you said it belongs to the United States if it doesn't belong to the States. I think what this Court has said is if it's not navigable, the United States has it. There would be a question. Well, there you are. And you think the United States is going to keep off these fishermen? The question is whether there would be a separate conveyance from the United States. There's certainly going to be plenty of private landowners, I think, who are going to claim private ownership. So there is going to be some sorting out to do. But you think they're wrong, right? Well, no. If the river is not navigable, then the lands didn't convey under the equal footing doctrine. There would be a separate question of whether they conveyed by some other Federal patent, land patent or the like. And there certainly are plenty of those. But I think what's clear is — Mr. Garre, you have said this is genuinely a controversy between the State and the United States. But the United States is not a party to this litigation. And we know from the briefing before us that the United States takes a different position than Montana. It doesn't agree with you. But if this case — how can the case be decided without any input from the United States when you say that's a true dispute? It's between the State and the nation? Well, the United States is here. It's given its views. It's true that it didn't participate below. And it is a little bit unusual. What's weird is that the United States has never actually asserted ownership to the riverbeds in this case. But I think — Does BPO pay rent to the United States? Not with respect to the riverbeds. There's a statement in the brief that suggests that they pay rent. That's with respect to the upland, the flooded lands, for example, along the reservoir. The United States has never charged rent for the use of the riverbeds themselves between the low water marks. But would you help me with this? Navigable waters of the United States for purposes of Federal jurisdiction over many activities such as boating is one concept. Navigable waters of the United States for purposes of State ownership of the bed serves a different purpose. Are the boundaries and the definitions of what is navigable coextensive and parallel and precisely the same in each case, or, on the other hand, are there some cases where a body of water, say the falls, is navigable waters of the United States, but not navigable waters of the United States for purposes of bed ownership by the State? And if there is a difference, can you tell me a case? And I think Justice Scalia basically was asking this earlier. There are two – well, there's three distinctions between the test for tidal and the test for regulatory purposes. Yes. None of which bear on the dispute in this case. One is for tidal, you look at the time of statehood. You don't look at the river at a later time. The next is, is that for purposes of tidal, you look at the river in its natural state. You don't look at improvements. And the third is, for purposes of tidal, the kind of commerce you consider is actually more expansive than the type you could consider for regulatory purposes. This case, the focus has been on the rivers at the time of statehood, their use as highways of commerce without improvements, which is in the heartland of the test for tidal for navigability under the Daniel Ball and the Montello. None of the distinctions that this Court has ever recognized would bear on this, nor would it make any sense, I think, to say that the rule that we identified in the Montello as that has been for more than a century has been established as the test for tidal for navigability somehow has to be applied differently in this case in a way that would require breaking up the rivers. And I think— But it is conceded, is it not, that if we rule for the power companies in this case, there still may be situation in which these waters can be navigable waters of the United States for other purposes other than ownership of the bed? Or am I wrong on that? No. I think the United States' position is say they're navigable for Federal purposes, but not for State purposes. And I think they've taken what I think is a pretty remarkable position. If you look at the briefs that we've appended to our brief, the United States and the Montana Power Company case, the United States is saying that the very same stretch of the Missouri along the Great Falls is navigable because it served as a continuous highway of commerce, and the falls did not prevent the river from being used as a continuous highway. And therefore, it's navigable under the Montello and the Daniel Ball, which is the theory that they recognize. And now they're here saying, well, that was only for regulatory purposes, not for tidal purposes. But it's the same test in both cases, and that's the test that the Nation has understood for more than a century. But I'm not sure it has the same consequences. It seems to me that regardless of who prevails in this case, the State will be able to exercise regulatory jurisdiction over the waters. You know, you can't fish during these seasons or there are different limits on how many fish you can take. And so will the Federal Government. It will be able to apply Federal law to the river, regardless of who owns parts of the river, regardless of who owns the land underneath. And so this Court has always recognized the State's authority to make those decisions as an essential attribute of their sovereignty. And that's why the State's not. Roberts, but I would say without regard to whether they happen to own the land under the river or not. Now, when they own the land under the river, the ability to control access along those rivers and fishing and the like is an essential attribute of State sovereignty. So just saying that, well, the Federal Government and the State can regulate together is, I think, an important intrusion on State sovereignty, as this Court has always understood under the Equal Footing Doctrine and the Public Trust Doctrine. And you also have the problem of competing regulation of these rivers, when you go from mile to mile, interruption to interruption, potentially thousands along rivers. And that's laid out in the brief by the environmental groups here in the National Wildlife Foundation and Trout Unlimited and other groups that talk about the problems with fragmented regulatory jurisdiction. And you also get into the question of public access for fishing, too. The rivers are used for commerce, but the Public Trust Doctrine was always used to protect access to rivers for fishing, too. And so if you look at a place like the Great Falls or the Thompson Falls, these are among the most sought-after fishing rivers in the world. Scalia, you're willing to concede on behalf of the State that if we find that the State does not have regulatory jurisdiction for all of these purposes that you're now describing? Absolutely not, Justice Scalia. Well, then your argument doesn't carry much weight. Well, I think the State can continue to regulate all those things, whether or not it owns the bed. And so every time this Court has said that the ability to do that is an essential attribute of sovereignty, it must not have meant it because the United States could do it, too. I mean, it is important to the States because having the sovereign capacity over those riverbeds as navigable waters under the Public Trust Doctrine is critical to the States' authority. But you have sovereignty over the land owned by other private persons. And I think it gets back to the Public Trust Doctrine, the equal footing doctrine, what this Court has said in the Utah case and other cases about the role of States in regulating navigable rivers and owning title to the riverbeds underlying those rivers. We haven't talked much about the Madison. What is your best piece of evidence with respect to the Madison for the proposition that it was navigable at statehood? Well, there was some evidence of use by fur trappers and the like. It was not extensive because this area was relatively sparse. Well, fur trappers are going to go. They don't need a lot of water to ply their canoes up the river. Well, and this Court has recognized that things like Pirogues and Bateau were sufficient to establish the continuous highway of commerce. I think the point on the Madison is a susceptibility for use as a navigable river. And the main point that we made below is that where their own expert recognized that PPL's dams had impeded the flow of water over the river, that if those dams impede the flow of water over the river, but yet today there are thousands of drift boats similar to the boats that would have used it at the time of statehood, then it's good evidence that it was susceptible for use. But I think the Madison is in a different category than the Missouri and the Clark Fork. I do want to answer the question about the 17 miles. The Des Plaines River in the Economy Light case, there was an 18-mile portage. That's made clear at page 18a of our addendum where the government recognized that. In Montella, it was a 5-mile portage, and there are other examples of portages. Sotomayor was that the canal, what subsequently became the canal area? I think that's right. It's in the testimony in that decision. But certainly, 17 miles, and the other thing is, is that in the amicus brief on page 27 of the Tubbs brief, she suggests that the actual portage before statehood was only 8 miles. I don't think you could draw a constitutional line between 5, 7, or even 10 miles and 17 miles. We think the line the Constitution draws is whether the river was served as a continuous highway of commerce, notwithstanding any interruption along that way. Sotomayor, I think that then the simplest rule is, is the river from shore to opposite shore, any portion of it, did boats traverse it? That would be, I think, what Justice Alito was asking. But it's not even the rule that PPL is asking for, because they acknowledge that some interruptions would be navigable. They call it non-de minimis. It's not clear how you get there. If you go between the low water marks, there's only part of the way that you could actually bring a boat up, but yet it's established that the State owns the entire riverbeds between low water mark to low water mark. After traversing the Missouri and the very falls at issue in this case, Meriwether Lewis described that he didn't think the world could furnish a finer example of a navigable river through a mountainous country than the Missouri. That assessment made by the President's own agent charged with assessing the suitability of the Missouri for commerce was consistent with more than 140 years of this precedent. Kennedy, did he write that during his 30-day, 32-day portage? Meriwether Lewis, Jr. Your Honor, it was an 11-day portage. At the time of statehood, it was a 1-day portage. I think what's significant is he wrote it after that portage, and yet he recognized that there was not a finer example of a navigable river through a mountainous country. That assessment was consistent with this Court's precedents for more than 140 years. It's consistent with the actual use of the Missouri as a continuous highway of commerce along the very stretch at issue here. We don't believe that PPL or the United States has provided a legal reason for this Court to overturn the judgment of the Montana Supreme Court that the Missouri or the other rivers at issue in this case are navigable. Roberts. Thank you, counsel. Mr. Clement, you have 4 minutes remaining. Clement, thank you, Mr. Chief Justice. A few points in rebuttal. First, it's Sotomayor, I don't care where they are in the United States. Give me a list of some that are de minimis. Clement, I mean, I don't have any de minimis portages for you. The portages he's talking about, as far as I can tell, the 5-mile and the 8-mile are portages between rivers. And that has nothing to do with whether the bypassed stretch of a river would be non-navigable because it's de minimis, because if you're portaged between two rivers, you're not bypassing anything. What I can talk about, sort of, portages being de minimis, if you look at the special master's report in the Utah case, there are a few places in the Cataract Canyon where he talks about portages. And he talks, you know, in parts where they got boats to. But the key point is, whenever the Court has talked about portages in the context of navigability, they've pointed to them as suggesting non-navigability. And in certain circumstances, they say, well, you had to portage a little bit, but that's not enough to make the stretch non-navigable. And what were your other four points you were going to give us? Well, I was going to give you a couple, Your Honor. I'd start with the deeds. You know, the State wants to make something the fact that the deeds stop at the river. But that's true throughout the State. And the question then becomes, what rule governs the ownership of the riverbeds? And that's where navigability versus non-navigability. So the deeds don't prove anything. That's just the way the deeds were written. The next point, Justice Kagan, you asked about, you know, do the other people on the river have anything to fear. And the answer, as far as I heard, was, well, these are different. They sit on the riverbed. Well, two things, Your Honor. So do some of the piers, and that's why people have filed amicus briefs and are very concerned. But more to the point, these things have not moved onto the riverbed recently. They've been sitting there for 100 years. And the State lent its eminent domain power to us to help us build these dams. These dams were critical to developing energy and development in this area. And now, 100 years later, they want compensation for the little river strip under that. Could the United States demand compensation? We pay the United States compensation right now. The difference is the United States isn't going in afterwards and trying to put a hold up to us and say they want $50 million for this. We pay rents to FERC for some of these lands. Actually, the State gets 37.5 percent of that tax. Scalia. For the riverbed, for the riverbed land? Or just the site land? Clements. Clements. Well, look at footnote 3 of the government's brief. I mean, again, the problem here is if you want people to have deeds that really sparse, parse out whether it's riverbed or upland, they don't, because everybody defaults to the bottom line, the background rule. The background rule is if it's a non-navigable river, the riparian owners, whether it be the United States or private property owners, get to midway, or if they own on both sides, they get the whole thing. I think on De Minimis, we talk about it a lot, but I would point out that the one thing we know that's not De Minimis from Utah is 4.35 miles, because that's what the Court analyzes separately in the portion of Cataract Canyon. Every stretch at issue here, every dam at issue here is more than 4.35 miles. Fully five of the dams are on the 17-mile Great Falls stretch, which they agree is impassable. The other five are reservoir dams that create reservoirs that extend over 4.35 miles. So there's nothing De Minimis, and the best evidence of that is the $50 million in compensation. I think the $50 million in background also shows that although this is a dispute between Montana and the United States, my client is caught in the middle of it and they're obviously concerned about it, too. I want to talk about what's disputed and what's undisputed. What's undisputed is the 17 miles is impassable. That's enough, as I say, to give us judgment as a matter of law for the five dams on that stretch. What is hotly disputed, despite my friend's representation, is whether or not there was through commerce, through this bypass route. He suggests it's undisputed that gold went from Helena down to Fort Benton down to St. Louis, and that, of course, is not disputed. But it went on roads. It didn't go on the upper Mississippi and the upper Missouri. And if you want to know who's got the better of this argument, I ask you to think about this question. The United States Army built a 600-mile overland road from Fort Benton, the traditional head of navigation on the Missouri, to Walla Walla, Washington. Now, if the State is right and the upper Missouri and the Clark Fork were navigable, all they had to do is have a 60-mile road to connect the two. They were never navigable. Thank you, Your Honor. Roberts. Thank you, counsel. Counsel. The case is submitted.